UNITED STATES of America,
Plaintiff,

v.

$688,670.42 SEIZED FROM REGIONS BANK ACCT. XXXXXX5028; and $49,603.68 seized from Regions Bank Acct. xxxxxx5540, Defendants.

Civil Action File No. 1:09–cv–1371–TCB.

United States District Court,
N.D. Georgia,
Atlanta Division.

Dec. 22, 2010.

Gerald S. Sachs, U.S. Attorney's Office, Atlanta, GA, for Plaintiff.

Albert L. Kemp, Jr., Kemp Ali, P.C., Nicholas A. Lotito, Davis Zipperman Kirschenbaum & Lotito, Robert Francis Schroeder, Law Office of Robert F. Schroeder, P.C., Atlanta, GA, Daniel S. Reinberg, Jeremy S. Unruh, Polsinelli Shugart P.C., Chicago, IL, for Claimants, Omar L. Toledo, Jack Henry & Associates, Inc.

## ORDER

TIMOTHY C. BATTEN, SR., District Judge.

In this action for forfeiture, the Government seeks to forfeit $688,670.42 seized from Regions Bank Account xxxxxx5028 and $ 49,603.68 seized from Regions Bank Account xxxxxx5540. Claimants PCPS Corporation ("PCPS"), Omar L. Toledo ("Toledo"), and Jack Henry & Associates, Inc. ("JHA") oppose the forfeiture and assert that they have a lawful claim to the money. Currently pending before the Court is PCPS's motion for summary judgment [85] and the Government's cross-motion for partial summary judgment as to PCPS and Toledo [103].[1]

## I. Background

As a preliminary matter, the Court notes that Claimants PCPS and Toledo have violated the Court's Local Rules. Specifically, in PCPS and Toledo's response to the Government's statement of material facts, they deny some of the Government's facts, but fail to support their denials with any citations to record evidence. This is a violation of Local Rule 56.1(B)(2), and it carries with it serious consequences, namely, the deemed admis-

---

1. The Government also filed a motion for leave to file excess pages [102] in connection with its cross-motion for partial summary judgment. The Court will grant this motion [102] as unopposed.

sion of all of the Government's stated facts. *See Brandon v. Lockheed Martin Aeronautical Sys.*, 393 F.Supp.2d 1341, 1347–48 (N.D.Ga.2005); *see also Jones v. Gerwens*, 874 F.2d 1534, 1537 n. 3 (11th Cir.1989). Accordingly, the undisputed facts in this action are as follows.

Medicare is a federally-funded health insurance system for eligible persons sixty-five years of age and older and certain disabled persons, pursuant to which physicians, hospitals, and other health care providers are reimbursed for covered medical services and supplies to Medicare beneficiaries. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), which contracts with various private insurance companies, such as Blue Cross Blue Shield ("BCBS"), to serve as its fiscal intermediaries and carriers. These insurance companies receive, process, and pay claims for reimbursement submitted by health care providers for services and/or supplies provided to Medicare beneficiaries.

In 2008 and 2009, four healthcare companies (Complete Medical Center, Inc.;[2] Elusive Quality, LLC; More Than Ready, LLC; and Ivana Medical Equipment and Supplies, LLC submitted false claims to BCBS for medical services that they did not provide. The companies then received reimbursement checks from BCBS on behalf of CMS. As a result, they fraudulently obtained funds from Medicare in violation of 18 U.S.C. § 1347.

PCPS and Toledo's role in the scheme is as follows. Third parties, known as bundlers, brought the fraudulently obtained Medicare checks to PCPS, a Florida-based check cashing business, for cashing. In processing the checks, PCPS deposited the checks into two Regions Bank accounts (xxxxxx5028 and xxxxxx5540) that were maintained in the name of a third party known as NV Professional Services ("NVPS"). To facilitate the processing of the checks, PCPS used the services of Jack Henry, a check clearing corporation. The gravamen of the Government's complaint is that when PCPS deposited and processed these checks, it knew that the funds represented the proceeds of unlawful activity. Consequently, by accepting the checks and processing them, the Government maintains that PCPS played a key role in advancing the underlying Medicare fraud.

On or about March 25, 2009, the Federal Bureau of Investigation served two seizure warrants upon Regions Bank to seize account xxxxxx5540, which contained $49,603.68 and account xxxxxx5028, which contained $688,670.42.

In the Government's second amended complaint for forfeiture, which was filed on May 26, 2010, it contends that all of the funds in the accounts are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) as property that constitutes or is derived from proceeds traceable to violations of 18 U.S.C. §§ 1341 and 1028, and 18 U.S.C. § 981(a)(1)(A) as property involved in or traceable to a money laundering transaction or an attempted money laundering transaction in violation of 18 U.S.C. § 1957.

Three claimants filed timely claims and answers in this case: (1) PCPS, through its owner and president, Beatriz Sardinas; (2) Toledo, in his individual capacity; and (3) JHA. However, the validity of JHA's claim is not at issue in the motions pending before the Court.

**2.** The president of Complete Medical Center, Alejandro Rodriguez, has pled guilty to healthcare fraud and to submitting false and fraudulent claims to Medicare from February 2000 through June 2008.

## II. *Discussion*

### A. *Summary Judgment Standard*

Summary judgment is proper when no genuine issue as to any material fact is present, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The movant carries the initial burden and must show that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991).

The nonmovant is then required to "go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions, and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Resolving all doubts in favor of the nonmoving party, the Court must determine "whether a fair-minded jury could return a verdict for the [nonmoving party] upon the evidence presented." *Id.* If reasonable minds could differ as to the conclusion drawn from the evidence in the record, the motion for summary judgment should be denied. *Id.* at 251, 106 S.Ct. 2505.

### B. *Civil Forfeiture Legal Framework*

■ Whether the nonmoving party has successfully raised a genuine issue of material fact must be determined in the context of the peculiar procedural requirements of the forfeiture laws. *See United States v. Four Parcels of Real Prop.,* 941 F.2d 1428, 1438 (11th Cir.1991). To invoke the Court's jurisdiction, a claimant must first show it has an interest in the defendant property sufficient to support standing. *See United States v. One Parcel of Real Estate at 1012 Germantown Rd.,* 963 F.2d 1496, 1500 (11th Cir.1992); *United States v. $38,000,* 816 F.2d 1538, 1543 n. 11 (11th Cir.1987).

■ Once a claimant has established standing, the Government must show by a preponderance of the evidence that the property at issue is subject to forfeiture. 18 U.S.C. § 983(c)(1). In making this showing, the Government may use evidence gathered after the filing of the complaint for forfeiture. 18 U.S.C. § 983(c)(2). Once the Government meets its burden, a claimant may defeat a forfeiture action either by showing by a preponderance of the evidence that the property is not subject to forfeiture or that it is an innocent owner of the property. *See* 18 U.S.C. § 983(d)(1); *United States v. Carrell,* 252 F.3d 1193, 1201 (11th Cir.2001).

### C. *Analysis*

#### 1. *Toledo*

The Government contends that Toledo lacks standing to contest this forfeiture action and that his claim should therefore be dismissed.

■ The threshold issue of a claimant's standing ensures that "the government is put to proof only where someone with a legitimate interest contests the forfeiture." *United States v. $557,933.89,* 287 F.3d 66, 78–79 (2d Cir.2002). Standing is a question of law for the court to decide. *Id.* at 78. A "bare assertion of ownership of the *res,* without more, is inadequate to prove an ownership interest sufficient to establish standing." *United States v. $38,570,* 950 F.2d 1108, 1112 (5th Cir.1992). In-

stead, a claimant seeking to establish standing must demonstrate both an ownership interest and dominion or control. *See United States v. A Single Family Residence and Real Prop. Located at 900 Rio Vista Blvd.,* 803 F.2d 625, 630 (11th Cir. 1986). This is because "people engaged in illegal activities often attempt to disguise their interests in property by placing title in someone else's name." *Id.* "Requiring dominion or control ensures that claimants have at least some actual connection to the property in question; they cannot be only bare title holders." *United States v. One 1990 Beechcraft,* 619 F.3d 1275, 1278 (11th Cir.2010).

The civil forfeiture provision at issue defines an "owner" as "a person with an ownership interest in the specific property sought to be forfeited including a leasehold, lien, mortgage, recorded security interest, or valid assignment of an ownership interest . . . ." 18 U.S.C. § 983(d)(6)(A). It does not include "a person with only a general unsecured interest in, or claim against, the property or estate of another; a bailee unless the bailor is identified and the bailee shows a colorable legitimate interest in the property seized; or a nominee who exercises no dominion or control over the property." 18 U.S.C. § 983(d)(6)(B).

■ Toledo is the husband of Sardinas, who is the owner and president of PCPS. It appears that Toledo may have been the president of NVPS, which is the entity in whose name the two Regions Bank accounts at issue were maintained. Toledo argues that he has standing to contest the forfeiture because he was the bailee of the funds.

Florida law, which the parties agree controls the bailment issue, defines a bailment as "a contractual relationship among parties in which the subject matter of the relationship is delivered temporarily to and accepted by one other than the own-

er." *S & W Air Vac Sys. v. Dep't of Revenue,* 697 So.2d 1313, 1315 (Fla.Dist. Ct.App.1997). "Among the chief features of bailments is the degree to which possession, custody and control of the subject matter is surrendered by the bailor to the bailee." *Id.* "It is the general rule that there must be such a full transfer, actual or constructive, to the bailee as to exclude the possession of the owner and all other persons and give to the bailee, for the time being, sole custody and control thereof." *Id.*

After careful review, the Court agrees with the Government that Toledo has failed to carry his burden of showing that he is the bailee of the funds or that he otherwise has a sufficient ownership interest in the funds to establish standing.

In his deposition, Toledo admitted that he did not understand the meaning of a bailment relationship and that he was unable to state or explain his claim to the money. He could not recall if he was part of NVPS and was surprised to learn that he had been listed as the company's president. Additionally, during his deposition Toledo frequently invoked the Fifth Amendment when questioned on this issue, which the Court may infer as an indication that his testimony would have been unfavorable to him. *See Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) (the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them); *Arango v. United States Dep't of the Treasury,* 115 F.3d 922, 926 (11th Cir.1997) ("Fifth Amendment does not forbid adverse inferences against civil litigants, including claimants in civil forfeiture proceedings . . . .").

Moreover, PCPS retained a large degree of control over the two bank accounts at issue. PCPS drew directly upon these

accounts to cash checks, transferred money into these accounts, and gave JHA a contractual right to withdraw funds from the accounts.

The Court also finds it telling that Toledo has not cited any evidence to support his argument that he has standing in this action. Toledo's argument regarding standing consists of nothing more than conclusory statements unsupported by citations to record evidence.

For all of these reasons, the Court finds that Toledo has failed to carry his burden of establishing standing to contest the Government's forfeiture of the funds. Consequently, the Court will grant the Government's cross-motion for summary judgment as to Toledo and will dismiss his claim.

### 2. *PCPS*

#### 1. *Standing*

■ The Government appears to acknowledge that PCPS has standing to challenge the forfeiture. Nevertheless, in an abundance of caution, the Court will briefly address the issue.

Although the two accounts from which the funds were seized were maintained in the name of NVPS, it is apparent that PCPS has an ownership interest in the funds. Under the processing services agreement that PCPS had with JHA, JHA deposited advances on the checks that PCPS was processing into these accounts, and PCPS drew upon these accounts to cash the checks. Moreover, PCPS gave JHA a contractual right to withdraw funds from these accounts as reimbursement for any shortfalls resulting from checks that did not clear. PCPS also had dominion and control over the funds before they were seized.

Because PCPS used the funds in its day-to-day operations, assigned an interest in the funds to JHA via a contractual agreement, and actively withdrew and deposited money from the accounts, the Court finds that PCPS has established standing to challenge the forfeiture. The Court will now move on to the next step in the forfeiture analysis, i.e., whether the Government has shown that the funds are subject to forfeiture.

#### 2. *Whether Funds Are Subject to Forfeiture*

As noted above, once a claimant establishes standing, the Government must show by a preponderance of the evidence that the property at issue is subject to forfeiture. 18 U.S.C. § 983(c)(1). "If the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3).

■ The Court has carefully reviewed the parties' arguments on this issue. Having done so, the Court finds that the Government has established that the funds in question are forfeitable as proceeds traceable to unlawful activity, including violations of 18 U.S.C. §§ 1341 (mail fraud) and 1028 (fraud in connection with identification documents) and/or property involved in a violation of 18 U.S.C. § 1957 (money laundering). In reaching this conclusion, the Court finds the following to be significant.

First, the Court finds PCPS's key argument against the Government's theory of forfeiture to be meritless. Throughout its brief, PCPS contends that the funds are not tainted because PCPS cashed the fraudulently obtained checks and turned over the proceeds to the bundlers. In other words, PCPS argues that because the checks were cashed, the unlawful proceeds were returned to the bundlers and were not retained by PCPS in its own accounts. To put it another way, PCPS

asserts that the Government's exclusive remedy is to forfeit the cash in the hands of the bundlers.

However, PCPS cites no ease that holds that a check-cashing company may shield itself in a civil forfeiture action on such a theory. Indeed, if PCPS's argument were accepted, it would be impossible for the Government to forfeit the assets of any check-cashing company that knowingly does business with fraudsters. Such a result is clearly not the law.

Indeed, in *United States v. Four Million, Two Hundred Fifty–Five Thousand,* 762 F.2d 895, 905 (11th Cir.1985), the Eleventh Circuit rejected an argument similar to the one advanced by PCPS. In that case, the court rejected the claimant's argument that because tainted money had been exchanged for goods of equivalent value, i.e., pesos, the Government's only remedy was to find and forfeit the pesos that ended up in the hands of the person who brought the tainted money to the exchange business in the first instance. In so holding, the court recognized that although the forfeiture laws are broadly worded, Congress created the "innocent owner" defense to protect third parties who unwittingly handle proceeds traceable to unlawful activity.

Here, PCPS asserts a similar argument—that the Government is barred from seizing the funds in the Regions Bank accounts, and must instead go after the goods of equivalent value—i.e., the cash paid out to the fraudsters. Simply put, PCPS's theory enjoys no support in this circuit.

PCPS's position also fails to appreciate that Congress has broadly defined the term proceeds in the forfeiture context.[3] For example, the proceeds of a health care fraud scheme are defined as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2)(A). Therefore, the Court has no trouble concluding that the funds in question constitute proceeds traceable to the specified unlawful activities.

Additionally, the Court finds it compelling that the Government has proffered detailed bank records that support its theory of the case. These records show that PCPS deposited the fraudulently obtained checks into the two accounts at issue. Because proceeds of the underlying Medicare fraud were deposited into the two accounts, the money seized has a substantial connection to unlawful activity. The Government has also shown by a preponderance of the evidence that PCPS commingled tainted funds with untainted funds to facilitate the unlawful activity, thereby rendering all of the funds in the two accounts subject to forfeiture. *See United States v. Seher,* 562 F.3d 1344, 1368 (11th Cir.2009).

Finally, it is highly significant that PCPS has not rebutted the Government's theory of forfeiture with any citations to record evidence. Specifically, PCPS has not identified any depositions, affidavits or other evidence that support its position or show the existence of a genuine issue of material fact. By contrast, the Government has adduced compelling evidence that the checks were deposited into

---

**3.** PCPS argues that a narrower definition of "proceeds" that was discussed in *United States v. Santos,* 553 U.S. 507, 128 S.Ct. 2020, 170 L.Ed.2d 912 (2008), should apply here. However, *Santos* is inapposite because it involved the definition of proceeds in the illegal gambling context, Indeed, the Eleventh Circuit has reasoned that *Santos* has limited precedential value and applies only to money laundering schemes involving illegal gambling. *See United States v. Demarest,* 570 F.3d 1232, 1242 (11th Cir.2009).

PCPS's accounts and that the funds in question are traceable to the specified unlawful activities.

For all of these reasons, the Court finds that the Government has shown by a preponderance of the evidence that the funds are forfeitable.

### 3. *"Innocent Owner" Defense*

Once the Government establishes by a preponderance of the evidence that the requisite connection exists and the seized property is subject to forfeiture, a claimant may defeat a forfeiture action by demonstrating that it is an innocent owner of the property. *See* 18 U.S.C. § 983(d)(1); *United States v. Carrell*, 252 F.3d 1193, 1201 (11th Cir.2001). The innocent owner defense, which is set forth in 18 U.S.C. § 983(d)(3)(A), provides:

> With respect to a property interest acquired after the conduct giving rise to the forfeiture has taken place, the term "innocent owner" means a person who, at the time that person acquired the interest in the property—
>
> (i) was a bona fide purchaser or seller for value (including a purchaser or seller of goods or services for value); and
>
> (ii) did not know and was reasonably without cause to believe that the property was subject to forfeiture.

To qualify as an innocent owner, PCPS must establish that it did not participate in the unlawful activity, that it had no knowledge that the funds were derived from or involved in unlawful activity, and that it was not willfully blind to the unlawful activity or that upon learning of the illegal conduct, it did everything reasonably expected under the circumstances to terminate the unlawful use of the funds. *See United States v. One 1988 Checolet 410 Turbo Prop Aircraft*, 282 F.Supp.2d 1379, 1382–83 (S.D.Fla.2003) (explaining that knowledge in civil forfeiture context is equated with willful blindness); *United States v. All Monies ($477,048.62) in Account No. 90–3617–3, Israel Discount Bank*, 754 F.Supp. 1467, 1477 (D.Haw.1991) (under civil forfeiture statute, "turning a blind eye" is equated with knowledge of the illegal activity).

PCPS argues that when it was presented with the checks it had no way of knowing that they were fraudulently obtained. PCPS also points out that the Government has not criminally prosecuted PCPS or Sardinas.[4]

After careful review, the Court is not persuaded by PCPS's arguments. Indeed, as with virtually all of the issues in this case, PCPS does not cite any evidence to support its argument that it did not know that the checks were fraudulently obtained. PCPS bears the burden of proof on the innocent owner defense; by failing to cite any evidence in support of the defense, PCPS has failed to discharge its burden and create a genuine issue of material fact on this defense.

---

4. PCPS also argues that Florida's "imposter rule" should govern this action. The imposter rule provides that as between a drawer who delivers a check to an imposter and one who cashes the check upon the imposter's endorsement, the loss is that of the drawer. *See* Fla. Stat. Ann. § 673.4041. Therefore, PCPS contends that the imposter rule would shift the loss to the drawer of the checks (Medicare), rather than to the entity that cashed the checks (PCPS). However, PCPS cites no case holding that Florida's imposter rule is applicable in a federal civil forfeiture action. Moreover, even if the imposter rule were applicable in a federal civil forfeiture action, PCPS could not invoke it because it did not act in good faith, as the rule requires. *See* Fla. Stat. Ann. § 673.4041. PCPS was confronted with several red flags that should have alerted it to the underlying fraud, including the fact that many of the checks at issue lacked endorsements and were altered.

Moreover, although it is true that the Government has not indicted PCPS or Sardinas, the Government has adduced substantial evidence that PCPS was not an innocent owner. The Government has shown that PCPS accepted fraudulently obtained Medicare funds, which were in the form of monetary instruments (i.e., checks), and attempted to disguise the money by funneling it into two bank accounts that it maintained in the name of NVPS. Sardinas, the president of PCPS, knew about other check-cashing schemes in South Florida, was aware of the pervasiveness of fraud and money laundering activities in South Florida, and had been told by PCPS's independent auditor that Medicare checks are problematic and have a high indicia of fraud. Sardinas had also been charged with money laundering in 1996. At a minimum, Sardinas was aware of the importance of ensuring the legitimacy of the funds that were received by PCPS. Sardinas further acknowledged that the typical checks cashed by PCPS were between $1,000 and $2,000, yet the checks at issue exceeded $10,000. Additionally, many of the checks at issue lacked endorsements or were altered in some way. Despite being confronted with all of these red flags, PCPS did nothing to investigate or ensure the legitimacy of the funds. PCPS's conduct evinces complicity in (or at least willful blindness to) the underlying unlawful activity, not innocent ownership.

For all of these reasons, the Court concludes that as a matter of law PCPS was not an innocent owner.

## III. *Conclusion*

For the foregoing reasons, the Court DENIES PCPS's motion for summary judgment [85], GRANTS the Government's cross-motion for partial summary judgment as to PCPS and Omar L. Toledo [103], and GRANTS the Government's motion for leave to file excess pages [102].